# Supreme Court of Texas

No. 24-0881

In the Interest of K.N., K.L., K.L., and K.L., Children

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

JUSTICE HAWKINS delivered the opinion of the Court, in which Chief Justice Blacklock, Justice Devine, Justice Busby, Justice Young, and Justice Sullivan joined, and in which Justice Lehrmann, Justice Bland, and Justice Huddle joined except as to Part V.

CHIEF JUSTICE BLACKLOCK filed a concurring opinion.

JUSTICE BLAND filed an opinion dissenting in part, in which Justice Lehrmann and Justice Huddle joined.

We consider another case in which the State of Texas seeks to permanently sever the legal bonds between two parents and their children. This is the second of two opinions issued this Term in which we illustrate the legal standards governing evidentiary-sufficiency challenges to parental-termination orders. As we explained in *In re H.S.*, ___ S.W.3d ___, ___ (Tex. June 5, 2026), "[f]ew principles in our history and traditions are as deeply rooted as the sanctity of the family." According that principle due respect, we enforce a "strong presumption" "that termination is not in a child's best interest," and we insist that "a

parental-termination order must always be a last resort and never a first impulse." *Id.* at ___. The law demands that every parental-termination order satisfy the rigorous requirements of the clear-and-convincing evidence standard. Anything less offends not only our Constitution and Family Code, but the innate "right and the corresponding responsibility" of parents "to direct their children's upbringing and to be their children's primary source of protection and guidance." *Id.* at ___.

*H.S.* demonstrated how those principles apply to the facts that case presented; we concluded that the record there supported the termination of one parent's rights, but not the other's. We turn now in this case to another family. The facts here are different, but the outcome is similar: we find that the record supports the endangerment predicate grounds for termination as to one parent, but not the other. We trust that our decisions here and in *H.S.* provide helpful guidance to our colleagues on the lower courts who confront countless heartbreaking cases of struggling, and sometimes broken, families.

## I

## A

Mother has four children, whom we will pseudonymously call Karen, Kimberly, Kayla, and Keith. *See* TEX. R. APP. P. 9.8(b)(1)(A). The eldest is Karen. Father is the father of Kimberly, Kayla, and Keith. Karen's biological father is involved in neither her life nor this appeal.

In February 2020, the Department of Family and Protective Services received a report from Karen's school indicating potential abuse. Karen, then age nine, had presented to the school nurse with

2

bruises on her arm and belt marks ranging from her back to her legs. Karen told the nurse she incurred these injuries when Mother gripped her arm and beat her with a belt. The nurse alerted the Department because these injuries were "out of the ordinary," and she would later testify that she had not previously seen discipline-related injuries of this sort with other children. The Department took no further action at this time (apparently due to the COVID-19 pandemic that began shortly thereafter).

Nearly a year later, in January 2021, the Department received and investigated a second report from the school indicating potential abuse of Karen. This report included three allegations: first, Karen had suffered a shoulder injury due to Mother's methods of physical discipline; second, Karen was forced to stand with her nose against the wall for long periods of time; third, Mother did not permit Karen to "eat like the other" children. An investigator from the Department interviewed Mother, Father, and the children at their home. Mother disputed much of the report but admitted that Karen was occasionally made to stand facing the wall for up to 30 minutes. After the interview, Father informed the school that he would not permit the Department to have any further contact with the children.

The Department nevertheless "continued to receive concerns from family members and school personnel." The Department's investigator attempted to discuss these "extra reports" with the family, but "wasn't able to get in contact with them." So in March 2021, the Department sought and received in district court an Order in Aid of Investigation that allowed it to take Karen and Kimberly to a children's advocacy

center where a trained interviewer could conduct a "forensic interview." The interviewer noted two concerns. First, Karen indicated a fear of being placed in a foster home. Second, Karen indicated that Father forced her to "kneel on rice for approximately ten minutes at a time."

The Department thereafter urged Mother and Father to agree to a "parental child safety placement," i.e., a short-term relocation for Karen. The parents ultimately agreed to allow Karen to live temporarily with her maternal grandparents, and it appears Karen did so at some point in 2021. Mother and Father refused to participate in any family-based services, such as counseling or parenting classes. The Department took no further action at that time, and at some point, Karen returned to live with Mother and Father.

A year elapsed, and regrettably, Karen's temporary relocation did not resolve the family's troubles. On March 4, 2022, the Department received another report of physical abuse—this time, a claim that Mother "grabs and drags [Karen] by her hair when she doesn't listen." Karen reported to a teacher that she would hide from Mother "in the closet" and was "scared to go home." A Department investigator spoke to Karen at school; Karen confirmed the allegations in the report, and added that "she's scared of her mother due to her mother's anger." When the Department attempted to speak with Mother about the allegations in the latest report, she refused to speak or otherwise cooperate. The investigator was able to speak with Father, who "said that things at home were okay." Father confirmed, however, "that he and his wife would not be cooperating with the Department."

4

In the subsequent weeks, Mother twice threatened the teacher who had made this latest report. On one occasion, Mother tracked the teacher down at a Walmart and "just kind of went off." Mother "blocked" the teacher's path and told her to "stay away from her daughter." Mother then began "screaming" obscenities at the teacher, calling her a "b***h" and saying that she "needed to watch [her] back." The teacher "t[ook] that as a threat." A grand jury later indicted Mother for "intentionally and knowingly threaten[ing]" harm to the teacher.

In late March 2022, the Department received yet another report from Karen's school. This time, Karen had passed a note to a different teacher, claiming that Mother was still dragging her by the hair. An investigator followed up, but Karen said she could not talk to the investigator because she had "gotten in trouble" for speaking with her and had been forced to sit against the wall for "days." Mother continued to refuse to speak with the Department and both Mother and Father refused voluntary services.

At that point, the Department escalated its intervention. It filed a petition requesting a court order for Mother's participation in services and Karen's participation in counseling. In April 2022, following a hearing, the associate judge signed a Temporary Order for Required Participation in Services. The order found "sufficient evidence" of either abuse or neglect, risk of abuse or neglect, or that Mother represented a "continuing danger" to Karen, and that "services are necessary to ensure the physical health or safety of the children." Among other things, the order directed Mother to participate in counseling, anger-management

classes, and a psychological evaluation. The court also ordered Karen to participate in counseling.

But the order did not produce its desired results. Mother and Karen failed to participate in any of the court-ordered services, and Mother and Father continued to refuse to let the Department contact any of the children. After the beginning of the new school year, the Department received a call concerning the children's well-being because they were not enrolled in school. The Department sent an investigator to check on the children; he was unable to make contact, but he later testified that law enforcement had been at the home and had seen the children.

**B**

That led to the court proceeding now before us. In August 2022, invoking the trial court's temporary emergency jurisdiction, *see* TEX. FAM. CODE § 152.204(a), and home state jurisdiction, *see id.* § 152.201, the Department filed its original petition. Among other things, the Department requested an order terminating Mother's parental rights as to all four children and Father's parental rights as to his three biological children—Kimberly, Kayla, and Keith. The petition further asked the court to appoint the Department the children's sole managing conservator. The trial court promptly entered an order for protection, finding "an immediate danger to the physical health or safety of the children." It appointed the Department the temporary managing conservator of all four children and issued writs of attachment. The next month, following an adversarial hearing, the court ordered Mother to

turn the children over to the Department no later than 5:00 p.m. on September 26.

Mother and Father did not comply. Instead, they took the children to Louisiana in late September 2022. On October 7, 2022, the Department filed in district court a status report indicating that Mother had "kidnapped the children" and could not be found. Weeks later, Mother was arrested in Louisiana "for kidnapping her 4 children." Louisiana Child Protective Services returned the children to Texas, where they were placed with their maternal grandparents, Grandmother and Grandfather. Mother and Father remained in Louisiana.

The parents' journey from there includes ups and downs. In a positive development, Mother notified the court that she had successfully participated in counseling and parenting classes in Louisiana. She passed a drug test. Father, regrettably, did not. In January 2023, he was arrested and charged with multiple felonies in Louisiana, including drug possession, following a high-speed chase with police. The activities leading to that arrest took place in Louisiana, while all the children were in Texas. Father blamed the failed drug test on an Adderall prescription, but he declined to sign a waiver allowing the Department to verify that prescription. Because of the failed drug test and Father's decision not to sign the waiver, Father was not able to visit the children. And although Mother satisfied the drug-test requirement, she did not exercise her right to in-person visitation, and participated in only one phone call with the children, in September 2023.

## C

The Department's termination petition proceeded to a jury trial in December 2023. The jury heard live testimony from fifteen witnesses—described in greater detail below—and spent nearly eight hours deliberating. On the fifth day of trial, the jury returned its verdict, finding predicate grounds for termination as to both Mother and Father because they endangered the children, constructively abandoned them, and failed to comply with the court's order establishing the actions necessary for return of the children. TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O). The jury found that termination of Father's parental rights was in all of the children's best interests. *Id.* § 161.001(b)(2). It also found that termination of Mother's parental rights was in Karen's best interest but not in the best interests of the other children. The trial court rendered judgment on the verdict. Although Mother's parental rights to Kimberly, Kayla, and Keith were not terminated, the court appointed the Department as permanent managing conservator for the children; Mother was limited to possessory conservatorship.

That same day, a caseworker attempted to schedule an in-person visitation between Mother and the three younger children. Mother stated that she and Father had already left the area to return to Louisiana and would not participate in visitation. All four children were initially placed with their grandparents, but were removed in January 2024 because the grandparents "did not wish to be [a] long term placement." The children were then placed with fictive kin who have expressed an interest in adopting the children.

8

Mother and Father appealed. 719 S.W.3d 388 (Tex. App.—Amarillo 2024). The court of appeals concluded that the record contained sufficient evidence that Mother endangered Karen, that termination of Mother's rights was in Karen's best interest, and that the trial court acted within the bounds of its discretion by appointing the Department managing conservator over the other children. *Id.* at 393-95. The court also affirmed the termination of Father's rights as to his three biological children. *Id.* at 396. It found sufficient evidence to support the jury's endangerment findings as to the predicate grounds in Paragraphs (D) and (E), and the jury's best-interest findings. *Id.* at 396-97. The court of appeals did not consider the portion of the trial court's judgment regarding the predicate grounds in Paragraphs (N) and (O). *Id.* at 393.

Mother and Father independently sought our review. Mother challenges the Department's appointment as managing conservator of Kimberly, Kayla, and Keith, and the sufficiency of the evidence underlying the trial court's endangerment finding as to Karen. Father likewise challenges the sufficiency of the evidence supporting the endangerment predicates under Paragraphs (D) and (E). Neither parent challenges in our Court the trial court's best-interest findings, and neither parent challenges the termination predicates under Paragraphs (N) and (O).

We granted each petition. We limit our review today to the issues actually presented to us. We express no view on the issues decided in the lower courts that Mother and Father did not press in our Court.

9

## II

As an initial matter, Mother and Father challenge the trial court's subject-matter jurisdiction over this dispute. Jurisdiction always comes first, and we must assure ourselves of our jurisdiction before proceeding to the merits. *See Rush Truck Ctrs. of Tex., L.P. v. Sayre*, 718 S.W.3d 233, 237 (Tex. 2025) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)).

The trial court below exercised jurisdiction under Section 152.204 of the Family Code, also known as the Uniform Child Custody Jurisdiction and Enforcement Act. Paragraph (a) confers "temporary emergency jurisdiction" on our State's courts "if the child is present in this state," subject to some conditions. TEX. FAM. CODE § 152.204(a). According to the parents, the trial court lacked "temporary emergency jurisdiction" because the children were not "present in th[is] state" on the date the protective order issued. Instead, the children were in Louisiana. The parents believe this renders the resulting termination orders "void."

The parents never made that argument below. The first time they suggested any jurisdictional defect came in their petitions for review in this Court. We therefore must consider a question we have not yet had occasion to answer: does Section 152.204(a) implicate subject-matter jurisdiction, that is, a court's "power to decide a case"? *Tex. Right to Life v. Van Stean*, 702 S.W.3d 348, 352 (Tex. 2024) (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553-54 (Tex. 2000)); *see also United Servs. Auto. Ass'n*, 307 S.W.3d 299, 306 (Tex. 2010). If so, the parents' challenge is properly before us. A defect in subject-matter jurisdiction

10

"can be raised at any time," without regard to the ordinary rules requiring proper issue preservation. *Van Stean*, 702 S.W.3d at 356 (quoting *Alfonso v. Skadden*, 251 S.W.3d 52, 55 (Tex. 2008)). If not, then the parents' challenge is forfeited because it was not preserved.

Whether a statutory provision implicates subject-matter jurisdiction can be difficult to assess due to the "intemperate" use of the term "jurisdiction"—"'a word of many, too many, meanings.'" *United Servs.*, 307 S.W.3d at 306 (quoting *Steel Co.*, 523 U.S. at 90). Sometimes, the term "jurisdiction" might refer to what we have come to call "genuine subject-matter jurisdiction." *Steel Co.*, 523 U.S. at 90; *see also Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 74-75 (Tex. 2000) (noting that a "judgment may properly be rendered against a party only if the court has authority to adjudicate the type of controversy involved in the action" (citing Restatement (Second) of Judgments § 11 (1982))). This "genuine subject-matter jurisdiction" implicates a court's "power to decide the case." *See United Servs.*, 307 S.W.3d at 306. Other times, "jurisdiction" might simply refer to "statutory prerequisites" that "implicate[] the right to relief, not the jurisdiction of the court." *Tex. Disposal Sys. Landfill, Inc. v. Travis Cent. Appraisal Dist.*, 694 S.W.3d 752, 759 (Tex. 2024). This use of "jurisdiction" does not implicate a court's power to issue a judgment on the merits.

We have attempted to alleviate this doctrinal difficulty through the adoption of a clear-statement rule. Under our precedents, we will not "read statutory mandates to be jurisdictional prohibitions absent clear indication that failure to comply with the mandate also deprives a court of the power to decide the claim." *Id*. (citing *Dubai Petroleum*, 12

11

S.W.3d at 76-77). When a statute's requirements do not provide dismissal as a remedy for noncompliance, "it is clear the Legislature did not mean [the requirement invoked] subject-matter jurisdiction." *Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 516 n.1 (Tex. 2007). This approach is laudable for several reasons, including that it "reduce[s] the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." *Tex. Disposal Sys.*, 694 S.W.3d at 759 (quoting *Dubai Petroleum*, 12 S.W.3d at 76).

The clear-statement rule demands special force in the context of suits affecting the parent-child relationship. Our precedents recognize the "overarching objective of expediency and stability," and the need to "prevent manipulation of the system and undue complication of child-custody disputes." *In re D.S.*, 602 S.W.3d 504, 513 (Tex. 2020). Of course, the need for stability and finality are "even more pronounced in child-custody cases." *Id.* at 520 (Lehrmann, J., concurring). And we have stressed that a "child's best interest is inherently threatened by undue uncertainty and delay in finally determining where the child will live and who will raise her." *In re K.S.L.*, 538 S.W.3d 107, 115 (Tex. 2017). Our law strives to avoid placing children in the crossfire of procedural gamesmanship, which disrespects the "sanctity of the family," *H.S.*, ___ S.W.3d at ___, and the best-interest-of-the-child standard at the heart of our Family Code. When a trial court has issued an otherwise lawful judgment, we will not uproot children and deny them the stability our law demands absent an unmistakable directive from the Legislature that that trial court never had the power to issue that judgment in the first place.

Applying this clear-statement rule, we have little difficulty concluding that Section 152.204(a) does not implicate subject-matter jurisdiction. As an initial matter, nothing in that paragraph's plain text refers to subject-matter jurisdiction, mandates dismissal, or otherwise uses language implicating the court's power to decide this type of dispute. Paragraph (a) refers simply to "temporary emergency jurisdiction" when the children are "present in this state." TEX. FAM. CODE § 152.204(a). But merely affixing the label "jurisdiction" and tying it to a physical location does not necessarily invoke subject-matter jurisdiction. *E.g.*, TEX. CIV. PRAC. & REM. CODE ch. 17, subch. C ("Long-Arm Jurisdiction"). Our Legislature knows how to clearly signal subject-matter jurisdiction when it wishes to do so. *See, e.g.*, TEX. GOV'T CODE § 23.002 (prescribing "subject matter jurisdiction over a criminal action"); *id.* § 311.034 ("Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity."). That it did not do so here is an important signal.

On top of that, several contextual clues indicate that Section 152.204 does not implicate subject-matter jurisdiction. First, as one Justice of this Court has cogently explained in a separate writing, "[t]he UCCJEA was primarily designed to remedy the increasingly common situation of courts in different states simultaneously exercising jurisdiction in child-custody cases." *D.S.*, 602 S.W.3d at 519 (Lehrmann, J., concurring) (citing *Powell v. Stover*, 165 S.W.3d 322, 325 (Tex. 2005)). That is, the statute operates to "prioritize" the jurisdiction of a child's "home state" over competing jurisdictional claims from the courts of other States. *Powell*, 165 S.W.3d at 325. That contextual background

13

strongly suggests the statute does not constrain the court's "authority to adjudicate the *type* of controversy involved in the action," *Dubai Petroleum*, 12 S.W.3d at 75 (emphasis added) (quoting Restatement (Second) of Judgments § 11 (1982)), but instead addresses *where* the suit should be litigated.

Still more clues point in the same direction. The UCCJEA permits the "agreement of the parties as to which state should assume jurisdiction." TEX. FAM. CODE § 152.207(b)(5). But subject-matter jurisdiction "cannot be conferred upon any court by consent or waiver." *Dubai Petroleum*, 12 S.W.3d at 76 (citation omitted). And the statutory scheme permits courts to "decline to exercise" jurisdiction when another State would be more convenient. TEX. FAM. CODE § 152.207(a). None of these features fits with our traditional conceptions of subject-matter jurisdiction, which concerns power, not convenience.

Finally, the Family Code provides that any final custodial order rendered by a court that lacks continuing, exclusive jurisdiction is "voidable." *Id*. § 155.104(b). But when a court lacks genuine subject-matter jurisdiction, its orders are void, not merely voidable. *Mapco, Inc. v. Forrest*, 795 S.W.2d 700, 703 (Tex. 1990). If anything, the use of "voidable" operates as a legislative pronouncement *against* construing the UCCJEA to implicate subject-matter jurisdiction.

When added up, these textual and contextual considerations are definitive. Section 152.204 does not implicate subject-matter jurisdiction. And because the parents did not present this challenge below, it is forfeited. Aware of no other potential defect in our jurisdiction, we proceed to the merits.

14

**III**

We briefly restate the foundational principles that guide our review of the decisions below.

**A**

The U.S. and Texas Constitutions both protect parents' natural and fundamental right to direct their children's upbringing. *See Mahmoud v. Taylor*, 606 U.S. 522 (2025); *Troxel v. Granville*, 530 U.S. 57 (2000); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923); *H.S.*, ___ S.W.3d ___; *Wiley v. Spratlan*, 543 S.W.2d 349 (Tex. 1976). So does our Family Code: "A state agency may not adopt rules or policies or take any other action that violates the fundamental right and duty of a parent to direct the upbringing of the parent's child." TEX. FAM. CODE § 151.003. "This natural parental right" is "a basic civil right of man," *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citation omitted), and it presupposes that the family unit is sacred.

Accordingly, the government may not sever the legal ties between parents and children without clearing a high bar. A court may terminate a parent's right to parent her child if it finds by clear and convincing evidence both that (1) the parent committed an act prohibited by Section 161.001(b)(1) of the Texas Family Code and (2) termination is in the best interest of the child. Here, the jury found that four separate grounds supported termination of the parents' parental rights, and the court of appeals affirmed, addressing only two of those grounds. Accordingly, we limit our review to whether legally sufficient evidence supports the jury's finding that the parents:

15

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

TEX. FAM. CODE § 161.001(b)(1)(D)-(E).

In conducting that review, we emphasize that the clear-and-convincing-evidence standard is unforgiving. It requires a degree of proof that elicits "a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980) (quoting *State v. Addington*, 588 S.W.2d 569 (Tex. 1979)). On appellate review, our precedents direct us to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

## B

In late 2025, after the parties filed their merits briefs but before our Court heard oral argument in this case, the People of Texas ratified a new Article I, Section 37 of our Constitution, "Parental Rights and Responsibilities." It provides:

To enshrine truths that are deeply rooted in this nation's history and traditions, the people of Texas hereby affirm that a parent has the responsibility to nurture and protect the parent's child and the corresponding fundamental right

16

to exercise care, custody, and control of the parent's child, including the right to make decisions concerning the child's upbringing.

TEX. CONST. art. I, § 37. We asked the parties to submit supplemental briefing on whether, and if so, how, this new provision should impact our decision today. The parties did so, and we are grateful to have received additional amicus briefing from a number of well-respected organizations and stakeholders.[1]

There is to date almost no developed jurisprudence on this newly minted Section 37, and we decline to become among the first to chart its parameters. We often insist that "we are a court of review, not of first view," *1 Coventry Ct., LLC v. Downs of Hillcrest Residential Ass'n*, 728 S.W.3d 711, 715 (Tex. 2026), and that when "the court of appeals has declined to consider an issue, this Court typically declines to do so in the first instance," *City of San Antonio v. Realme*, 731 S.W.3d 342, 355 (Tex. 2026). That practice is "especially crucial" when we confront "novel . . . constitutional issues with ramifications far beyond this case." *In re Troy S. Poe Tr.*, 646 S.W.3d 771, 780-81 (Tex. 2022). In these situations, "this Court's preferred process is to decline to address and defer such questions until after complete vetting of the parties' potential arguments in the lower courts." *Id.* at 780 (citation omitted); *see Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 812 (Tex. 2023) ("When reversal necessitates consideration of issues

---

[1] The Court thanks the Family Freedom Project, Texas Public Policy Foundation, Celia M. Wood, Texas Association of Family Defense Attorneys, Institute for the Advancement of Justice and Human Rights, and Texas Lawyers for Children for their helpful submissions.

raised in but not decided by the court of appeals, we ordinarily remand the case to that court for further proceedings." (citing *Tex. Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 550 (Tex. 2022))).

There is good reason that courts of last resort are so hesitant to be the first to decide issues: we are more likely to err when we are the first to weigh in, and as a court of last resort, our errors cannot easily be undone. Our Court thus functions best when it reviews the decisions of lower courts that have already "test[ed] competing understandings." *Perez v. City of San Antonio*, 711 S.W.3d 204, 204 (Tex. 2024) (statement of Young, J.); *see Poe Tr.*, 646 S.W.3d at 781. Prudence, humility, and a proper respect for our own frailty all caution that "the law is typically better served when the lower courts review a legal issue before this Court does." *Rattray v. City of Brownsville*, 662 S.W.3d 860, 869-70 (Tex. 2023).

Heeding that wisdom, we say only that we do not believe that our decision today, driven by the unique facts of this particular record, conflicts with Section 37. We leave a more robust discussion of this new provision of our Constitution for another day, following appropriate percolation in the lower courts and a better developed body of jurisprudence that "test[s] competing understandings." *Perez*, 711 S.W.3d at 204; *see Poe Tr.*, 646 S.W.3d at 781.

## IV

We turn now to Mother. She presents two issues in our Court. First, she argues that the evidence was insufficient to support the endangerment predicate grounds for termination of her parental rights as to Karen. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). Second, she

18

argues that the evidence is insufficient to justify appointing the Department managing conservator over the three younger children. We take them in turn.

**A**

**1**

On close review, we believe the evidence was sufficient to establish the Paragraph (D) and (E) predicates underlying Mother's termination order. Over the course of a five-day trial, the jury heard testimony from thirteen witnesses that had personal experience with the family, including Department investigators and services workers, law enforcement, school personnel, maternal family members, licensed children's counselors, and other childcare and child-development professionals. The record shows two distinct categories of abuse: physical and emotional.

First, the jury heard evidence of physical abuse. The first report from Karen's school to the Department came from a nurse who testified that the bruising on Karen's arms and the belt marks on her posterior were "out of the ordinary," beyond the discipline-related injuries seen in other children. Grandmother offered similar testimony, describing the punishments that Karen received as inappropriate and "[e]xcessive." In one instance of "excessive" punishment, Grandmother observed Karen to have bruises "down her leg." Grandmother testified that when she tried to speak to Mother about her treatment of Karen, Mother would withhold the children from her.

Mother's sister testified similarly. Mother's sister confirmed that Karen had said she had been forced to stand in her room "for hours." She

19

also testified that Karen said she was forced to sleep on a large pillow on the floor—referred to as a "dog bed"—and when that was removed, she slept with just a blanket and a pillow on the floor. Mother's sister also reported seeing marks on Karen's neck when she was approximately seven years old that Karen stated were the result of a physical altercation with Mother.

Mother's own testimony at trial confirmed much of this evidence. She admitted to spanking Karen and that Karen "might have had a bruise or two on her" from Mother "trying to bust her bottom." Mother further testified that she gives Karen timeouts that require Karen to sit or stand against a wall, though she claimed this punishment would last "[n]o more than thirty minutes."[2]

This physical abuse also took the form of food deprivation. Karen told school personnel that she was not allowed to "eat like the other" children. A Department investigator testified that although Mother would cook for the rest of the family, Karen was given a cold sandwich. Family members independently reported observing Karen "scarf down food and want seconds as if she ha[d] not eaten in days." The Department received multiple similar reports from school personnel alleging that Karen was not allowed to eat breakfast at school, "was usually starving by lunchtime," and always asked for seconds. Unlike

---

[2] To be sure, Mother's testimony disputed much of the Department's evidence. But as an appellate court, we have no authority to decide which witnesses were more credible, and which version of events was more likely true. *E.g.*, *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The jury was entitled to believe or disbelieve Mother's testimony, and we have no basis to overturn its decision so long as it is supported by the record.

her sister, Karen never had money to purchase ice cream at school. Grandmother confirmed that Mother restricted Karen's food, testifying that Karen "was not allowed to eat certain foods, and only allowed to eat at certain times without the family." Mother's sister testified that "the other kids also told [her] that" Karen was not allowed to eat with the family.

Second, the jury heard evidence indicating Mother emotionally or psychologically abused Karen. One indication is the disparate punishment imposed on Karen alone and not the other children. The jury heard testimony that Karen was the only child regularly subjected to lengthy wall sits and wall stands, by most accounts lasting for hours at a time. A Department investigator testified that Karen once told her she could not speak to the investigator because she had "gotten in trouble" for speaking to her the first time and was forced to sit on the wall for "days." Karen also claimed that "[a]nytime it was nice outside" she would be forced to sit against a wall and watch her siblings play outside. Grandmother confirmed that Karen "was kept in her room for the majority of her time, not allowed to socialize with any of the other children." Grandmother also testified that the other children were aware that Karen was treated differently in the house. In one such instance, Kayla confirmed that Karen "was never allowed to eat with [them] at the dinner table."

The testimony regarding food deprivation, while indicative of physical abuse, may likewise indicate emotional abuse. When it came to food, Karen was singled out. She was not allowed to eat what everyone

21

else ate, and she was often forced to eat alone. The jury was entitled to conclude that this endangered Karen's emotional well-being.

Karen's own actions corroborate much of the above evidence, and the jury was entitled to give her experience substantial weight. For example, a Department investigator testified that in March 2021, Karen "was very, very worried" that she would be taken from her parents. The investigator further testified that Karen "was very emotional" because Mother told her that a foster home was a "very, very bad place for mean children." Yet just a year later, Karen made an outcry to a teacher—whom she did not know—that she was scared to go home. She complained that Mother "had been dragging her by her hair." Karen reported that Mother coerced her into silence by threatening that if Karen told anyone of Mother's abuse, Karen "would go to a foster home where she was treated worse." Karen made another outcry detailing the same behavior a few weeks later. The jury could reasonably infer that although the mere prospect of placement in a foster home sent Karen into distress just a year earlier, the abuse at home was severe enough to lead her to invite that potential consequence. This inference aligns with live testimony heard by the jury, including Karen's counselor's testimony that Karen's "biggest fear" was returning home to Mother, and Grandmother's similar testimony that Karen was scared of Mother and "refuse[d]" to go home.

It is notable that so much of the critical testimony came from Mother's family members—her own mother, and her own sister, both of whom testified unequivocally to Karen's abuse. Due to the naturally deep bonds between many children and their extended family, our

Family Code affirmatively recognizes the "Rights of [a] Grandparent, Aunt, or Uncle." TEX. FAM. CODE §§ 153.431-.434. Grandparents in particular are afforded special solicitude in matters related to child custody and visitation. *Id.* § 153.432; *see also id.* § 102.004. These relatives, after all, are part of the family unit—and in many cases part of their grandchildren's daily life. *See Troxel*, 530 U.S. at 63-64. Grandmother here was Karen's primary caretaker for a substantial period of time in 2021. The jury was entitled to give substantial weight to that experience and believe Grandmother's and aunt's testimony that in their view, Mother is not fit to parent Karen due to excessive and prolonged instances of physical and emotional abuse.

Summing up, over the course of a five-day trial, the jury heard competent evidence of repeated and ongoing instances of physical abuse, emotional abuse and food deprivation. Karen was beaten and bruised, repeatedly, for years, in incidents reported by many witnesses who told the jury such violence exceeded the limits of traditional discipline. She was dragged by her hair. She testified that she hid from Mother in a closet, and that she was afraid to go home due to Mother's anger. She suffered a shoulder injury. She was forced into painful punishments involving kneeling on rice or standing at a wall for extended periods. She was denied food repeatedly. She was singled out among her siblings for special mistreatment.

For all the above reasons, we see no basis to override the jury's decision that Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," TEX. FAM. CODE § 161.001(b)(1)(D),

and that Mother "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E).[3]

**2**

Before moving on, we pause to caution the lower courts that a parent's reasonable reliance on traditional methods of discipline, including corporal punishment, does not support a termination of parental rights. Our Family Code expressly authorizes parents to "use corporal punishment for the reasonable discipline of a child." *Id.* § 151.001(e)(1). After all, "deeply rooted in our Nation's history and tradition[] is the belief that the parental role implies a substantial measure of authority over one's children." *Bellotti v. Baird*, 443 U.S. 622, 638 (1979). But we have always recognized that "cruel, outrageous, and vicious" discipline "with intent to injure" a child is not parenting—it is "aggravated assault upon a child." *Stanfield v. State*, 43 Tex. 167, 168 (1875).

The record here satisfies us that the jury's verdict does not improperly rest on a disapproval of lawful traditional discipline. As recounted above, there was sufficient evidence to conclude that Mother crossed the line through physical and emotional abuse. Moreover, the

---

[3] The lower courts and the Department highlighted other evidence they believe support the judgment below. We do not recount that evidence here because it is not the basis of our judgment. "Appellate opinions in these important cases" should avoid "reciting every piece of evidence relied upon by the government," and focus instead on the evidence that actually does the work. *In re A.M.*, 630 S.W.3d 25, 27 (Tex. 2019) (Blacklock, J., concurring in the denial of the petition for review). A kitchen-sink approach risks misleading lower courts as to what evidence matters.

24

jury heard evidence that Mother employed corporal punishment to discipline at least one other child, yet the jury nevertheless declined to find that termination of Mother's rights was in that child's best interest. And this is not a case where we are concerned that the jury gave a cursory glance at particularly nuanced facts. Rather, the jury returned a mixed verdict after nearly eight hours of deliberations, agreeing with the Department on some issues, and with the parents on others.

**B**

We now turn to Mother's challenge to the Department's appointment as permanent managing conservator of the three younger children—Kimberly, Kayla, and Keith. As we explained above, Mother's parental rights were terminated only as to Karen. The trial court left Mother's parental rights intact as to those younger children, but appointed her possessory conservator.

Our Legislature has announced a "presumption" that a parent be appointed managing conservator except where "the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." TEX. FAM. CODE § 153.131(a). The Legislature has further implemented "a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." *Id.* § 153.131(b). That presumption is "remove[d]" in cases presenting "a history of family violence involving the parents of a child." *Id.*

Compared to termination, the conservatorship statute "imposes a more general standard that does not enumerate specific acts or

25

omissions by the parent, but instead requires the court to find that appointing a parent would not be in the child's best interest because it would 'significantly impair the child's physical health or emotional [development].'" *In re J.A.J.*, 243 S.W.3d 611, 615-16 (Tex. 2007) (quoting TEX. FAM. CODE § 153.131(a)). A "significant impairment" finding must be proven by evidence of particular injurious acts or omissions. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990). This finding is subject to a preponderance-of-the-evidence standard, *see* TEX. FAM. CODE § 105.005, which is in turn reviewed "only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable." *J.A.J.*, 243 S.W.3d at 616 (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)).

On this record, the trial court did not err in denying Mother managing conservatorship of the three younger children:

- Mother inflicted physical and emotional abuse on Karen serious enough to establish an endangerment predicate to termination. A "parent's treatment of other children may be relevant" to a conservatorship determination. *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.) (citing *In re S.D.*, No. 02-14-00171-CV, 2014 WL 6493783, at *15 (Tex. App.—Fort Worth Nov. 20, 2014, no pet.)).

- On two occasions, Mother ambushed, screamed at, and threatened one of the teachers who had reported Karen's abuse. A grand jury later issued a criminal indictment against Mother in connection with these actions. Having recognized that criminal misconduct is a relevant consideration, *see Danet v. Bhan*, 436 S.W.3d 793, 797 (Tex. 2014), it follows that misconduct of a *violent* nature may be accorded greater weight.

26

- The record shows that the three younger children suffered from Mother's neglect. Grandmother testified that when the children were placed with her, Kimberly had eleven cavities, Kayla and Kimberly both needed glasses, Karen had warts on her hands and mouth that required multiple doctor's visits, and Kimberly had suffered a seizure that was never diagnosed. A parent's failure to provide for their children's basic health needs is an appropriate consideration. *See S.T.*, 508 S.W.3d at 492 (affirming consideration of neglect and "parental irresponsibility").

- After the children were removed to Texas, Mother made effectively no effort to see them. She remained in Louisiana. In the months leading up to trial, she participated in only a single phone call with the children. A parent's failure to interact with her children is an appropriate consideration. *See Danet*, 436 S.W.3d at 797.

Reasonable jurors could add up these facts and decide, when viewed cumulatively, that Mother is not an appropriate managing conservator.

However, in light of our disposition of Father's appeal, which we explain below, it may be appropriate for the lower courts to reassess appointment of the Department as managing conservator. The conservatorship determination is wrapped up with—and accordingly, dependent upon—the termination of Father's parental rights to those children. Father has shown that the evidence does not sufficiently establish the endangerment predicates under Paragraphs (D) and (E)— two of the four predicate grounds identified in the termination order. On remand, following its review of the remaining predicate grounds as to Father, the court of appeals should reassess managing conservatorship. *See generally J.A.J.*, 243 S.W.3d at 616.

# V

We now turn to Father's petition. He, like Mother, challenges the evidentiary sufficiency supporting the predicate grounds for termination under Paragraphs (D) and (E), which concern endangerment.

The Department presents four arguments to support the trial court's endangerment findings as to Paragraphs (D) and (E). First, Father "failed to protect" Karen from Mother's abuse and "to protect the other children from being exposed to it." Second, after the children were removed to Texas, Father instigated a high-speed police chase in Louisiana; when he was subsequently arrested, he had on his person methamphetamine. Third, after removal, Father tested positive for amphetamine (a different substance from methamphetamine), and refused to submit medical records verifying a valid Adderall prescription that would justify the positive amphetamine test. Fourth, Father "made little effort at reunification."

Even viewing the jury's verdict in its most favorable light, these facts do not establish that Father "knowingly placed or knowingly allowed" his three biological children "to remain in conditions or surroundings which endanger [their] physical or emotional well-being." TEX. FAM. CODE § 161.001(b)(1)(D). Nor do they show Father "engaged in conduct or knowingly placed" his three biological children "with persons who engaged in conduct which endangers the physical or emotional well-being of" Kimberly, Kayla, and Keith. *Id*. § 161.001(b)(1)(E).

**A**

On this record, we do not agree that Father's alleged non-intervention in Mother's abuse of *her* child supports the termination of Father's parental rights as to *his own* children. While Father did participate in some instances of Karen's discipline, the record does not show that he himself abused her in the same ways that led to Mother's termination. Father was never named in any of the reports Karen's school submitted to the Department. He was never ordered to complete services.[4]

To the contrary, the record shows that Father would "take up" for Karen and attempt to mitigate Mother's disciplinary methods. He occasionally rebuked Mother when he thought she went too far—encouraging her to give Karen her iPad back, giving Karen snacks, and allowing her to play outside with her siblings. It appears, in other words, that Mother's abuse of Karen would have been *worse* but for Father's intervention. And Grandmother and Mother's sister both testified that Father acted as a "go-between" in several instances, ensuring they could see the children when Mother would otherwise withhold them.

---

[4] We respectfully disagree with our dissenting colleagues' view that Father himself "participat[ed] in the abuse of Karen" or that he "took part in some of" Mother's "extreme actions." *Post* at 1, 11, 12, 22 (Bland, J., dissenting). The record shows that Father participated in disciplining Karen when he forced Karen to "kneel on rice for approximately ten minutes at a time." But as we discussed above, our Family Code expressly authorizes "corporal punishment for the reasonable discipline of a child." TEX. FAM. CODE § 151.001(e); *see also Bellotti*, 443 U.S. at 638 ("[T]he parental role implies a substantial measure of authority over one's children."). Father's own actions as to Karen, while perhaps disfavored in some communities, plainly fall within the boundaries of our law.

The Department and dissent likewise claim that Father endangered his three biological children by allowing them to be present in a home in which Mother abused Karen. But mere proximity to wrongdoing is insufficient, and we see no evidence that the three younger children were subjected to abuse. *H.S.*, ___ S.W.3d at ___ ("[W]hen a parent's rights may be terminated based on a *spouse's* violence, the department should proceed with particular caution[.]"). Indeed, much of the reason for Mother's termination order is because she intentionally *singled out* Karen for uniquely abusive treatment. *See supra* pp. 20-26.

This case thus differs substantially from *In re J.W.*, where a father failed to protect his own child from the mother's egregious abuse *of that same child*—and even under those circumstances, we concluded the evidence was insufficient to support an endangerment finding as to the father. 645 S.W.3d 726, 749 (Tex. 2022). Had Mother abused the three younger children to the same extent she abused Karen, Father's acquiescence would implicate different doctrinal considerations. And, as noted above, Father does not have and never has had formal parental rights as to Karen.

**B**

Next, the Department invokes Father's dangerous police chase and possession of methamphetamine months after the children were removed. Our precedents instruct that when it comes to criminal malfeasance, termination may be available when the Department can establish a "course of conduct" that has the effect of endangering the child. *See In re J.F.-G.*, 627 S.W.3d 304, 312-13 (Tex. 2021) (quoting *Tex.*

30

*Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533-34 (Tex. 1987)). But isolated criminal misconduct does not necessarily suffice even when it results in "imprisonment," which we have held "will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Boyd*, 727 S.W.2d at 533. Instead, our precedents instruct that "the Department bears the burden of introducing evidence concerning the offense and establishing that the offense was part of a voluntary course of conduct that endangered the children's well-being." *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012).

This record does not establish the "course of conduct" necessary to clear the high bar our precedents set. We of course do not make light of Father's criminal misconduct. We merely reaffirm what we have said in the past: the termination of parental rights implicates foundational rights and principles that require the government to clear a high bar—and not all conduct we find reprehensible justifies this most draconian of sanctions.[5]

---

[5] The police chase, arrest, methamphetamine possession, and amphetamine test all occurred months after the children had been removed from Father, when they lived in a different State. Our precedents have cast doubt on the extent to which *post-removal* conduct informs the Paragraph (D) and (E) endangerment predicates. *See, e.g.*, *J.W.*, 645 S.W.3d at 749 (observing that "typically, a parent whose child has been removed and who has only supervised visitation has no control over the child's environment, and the parent's conduct during that time will thus be unrelated to [Paragraph] (D)"); *In re C.E.*, 687 S.W.3d 304, 307 (Tex. 2024) (identifying the "relevant timeframe" for endangering conduct under Paragraph (E) as the time when the parent was the child's caregiver, before the child was removed). Our Court has never declared conclusively that post-removal conduct is categorically irrelevant to the Paragraph (D) and (E) predicates, and we do not so hold today. Whatever the answer to that question may be, it is sufficient to resolve this case to say that the Department has failed to show the endangering "voluntary

## C

The Department next points to Father's drug test results, which occurred months after the children were removed, and which indicated the use of amphetamine—a substance found in prescription drugs like Adderall, which differs from the methamphetamine Father possessed at the time of his arrest. This, too, fails to supply a termination predicate.

Of course, the use of illegal drugs may properly be considered in a termination proceeding because drug use may constitute endangering conduct and involve endangering conditions. *See In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024); *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). We have confirmed that "[d]rug use during pregnancy supports a finding of direct injury to the child." *In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024). So too have we affirmed the termination of parental rights of parents who use illegal drugs chronically, or while caring for children. *E.g.*, *R.R.A.*, 687 S.W.3d at 278 (noting that "a *pattern* of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment" (emphasis added)); *J.O.A.*, 283 S.W.3d at 346 (noting the probative value of "a long history of drug use and irresponsible choices"). But as we expressly cautioned in *R.R.A.*, "illegal drug use alone may not be sufficient to show endangerment"; rather, a reviewing court "should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" 687 S.W.3d at 278 (quoting *J.O.A.*, 283 S.W.3d at 345).

---

course of conduct" necessary to justify the civil death penalty. *E.N.C.*, 384 S.W.3d at 805.

Here, the Department does not claim that Father used drugs while he was with the children. The Department never argues that Father exhibited a course of drug use while parenting. The Department does not claim chronic use or addiction that creates "related dangers to the child." *Id*. And the Department acknowledges that the drug at issue—amphetamine—would not even be unlawful if prescribed by a physician, which Father claims (but did not prove) is the case here. This does not establish that Father "used illegal drugs in a manner that created a substantial risk of harm to his children" sufficient to support the termination of parental rights. *Id*. at 272; *cf. J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [Father] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices.").[6]

## D

Finally, the Department posits that Father endangered his children because he "made little effort at reunification." The Department barely develops this argument, noting Father "also made little effort to visit the children during his periods of visitation, and made virtually no effort to comply with his service plan." This evidence is primarily probative here to the extent that it relates to the now-repealed Paragraph (O), which is not before us today and which the court of appeals may consider on remand. *See* TEX. FAM.

---

[6] In a footnote, the Department notes (and the dissent echoes) Father's 2017 conviction "for dangerous-drug possession." The record provides no further details, and the Department does not claim it establishes a pattern of drug use that harmed the children.

CODE § 161.001(O) (repealed 2025) (allowing termination where a parent has "failed to comply with the provisions of" a court-ordered service plan). The Department's brief offers no reason to conclude that poor efforts at reunification amount to "endangerment."

To the extent the Department argues that Father's abandonment is a form of endangerment, the record here shows that the four children have been cared for by family members (including Grandmother) and fictive kin. We of course agree that there are situations—many situations—in which an act of abandonment may in fact endanger the child, but the record does not support that conclusion here.

\* \* \*

We stress the limited nature of our holding. The trial court found termination predicates under Paragraphs (D), (E), (N), and (O), and it found that the children's best interests supported termination of Father's parental rights. All we have decided today is that the evidence does not establish the Paragraph (D) and (E) predicates as to Father— the sole merits issue raised in Father's petition for review in our Court. We express no view on the trial court's determinations as to Paragraphs (N) or (O), nor do we address the evidence and judgment related to the children's best interests.[7]

---

[7] The dissent faults us for declining to reach Paragraph (N) as an alternative basis to affirm the judgment below. But the Department's brief never asks us to treat Paragraph (N) as an alternative basis to affirm. The closest it comes is to claim that Father's appeal is "futile," and the entirety of its discussion of Paragraph (N) in our Court consists of a single paragraph with one record citation. We believe Paragraph (N) requires more analysis, and we are confident the parties and court of appeals will give the issue due consideration on remand. Regardless, "[w]hen reversal necessitates

34

## VI

As to Mother, we hold that legally sufficient evidence supported the Paragraph (D) and (E) predicates that led to the termination of her parental rights as to Karen. We further find no reversible error in the trial court's order failing to appoint Mother permanent managing conservator. However, in light of our disposition of Father's appeal, the lower courts should reassess the appointment of the Department as permanent managing conservator as to Kimberly, Kayla, and Keith after the remainder of Father's appeal is resolved. The judgment below as to Mother is affirmed in part and vacated and remanded to the court of appeals in part.

As to Father, we hold that the evidence was legally insufficient to establish the endangerment predicates under Paragraphs (D) and (E). We express no view on the issues not before us, including whether sufficient evidence established the predicates under Paragraphs (N) and (O), and the best-interest determination. The judgment below as to Father is reversed, and this case is remanded to the court of appeals for further proceedings consistent with this opinion.

---

consideration of issues raised in but not decided by the court of appeals, we ordinarily remand the case to that court for further proceedings." *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 812 (Tex. 2023); *see also In re N.L.S.*, 715 S.W.3d 760, 766-67 (Tex. 2025).

                                         _____

Kyle D. Hawkins
Justice

**OPINION DELIVERED:** June 5, 2026